## 2866.  SMITH *v.* THE STATE.

1. There was sufficient evidence to authorize the submission of instructions upon the subject of voluntary manslaughter and to sustain the verdict finding the accused guilty of that offense.

2. The case did not involve involuntary manslaughter, and, as an abstract proposition, it was error to submit instructions to the jury as to that offense; but the error is harmless, as the jury found that the defendant was guilty of voluntary manslaughter, thereby plainly disregarding the instructions as to involuntary manslaughter.

3. In seeking to introduce evidence of alleged dying declarations, State's counsel may prove by one or more witnesses the condition of the deceased person, his consciousness or lack of consciousness, and the circumstances tending to show that he realized that he was going to die, and then prove by other witnesses, not having information as to these facts, what statement the deceased person really made.

4. The charge of the court as a whole was not subject to the exceptions taken to it.

DECIDED JANUARY 31, 1911.

Conviction of manslaughter; from Gwinnett superior court— Judge Brand. July 12, 1910.

*John R. Cooper, J. A. Perry, I. L. Oakes,* for plaintiff in error.
*Clifford Walker, solicitor-general, O. A. Nix,* contra.

POWELL, J. 1. The accused was indicted for murder and convicted of voluntary manslaughter. Able counsel for the accused strenuously insist that the verdict is without evidence to support it; that it is a compromise; that the State's testimony made an unmitigated case of murder and the defendant's testimony a case of justifiable homicide. Under the defendant's statement, the jury (especially considering the latitude they have in dealing with the defendant's statement) were authorized to render the verdict of voluntary manslaughter. The defendant admitted that he did the killing. The deceased had been cursing, and probably gambling, on his place, and he went out to make him leave. The deceased continued cursing. The accused then fired the gun which he brought with him. He said that he did not fire at the deceased, but fired into the air to scare him. The jury, however, had the right to disbelieve so much of the statement as set up that the firing was done merely to frighten, especially as one of the witnesses said that the shot could be heard going through the corn, indicating that they were not fired up into the air. After stating that he had thus fired the gun, the defendant continued in his statement as follows: "I made a turn to go back in the house, and he [the deceased] grabbed up a scantling and said, 'God damn you, I will kill you!' and drawed it back. I stepped back and said, 'Don't you come on me.' He said, 'God damn you, I will kill you!' I throwed the gun up and shot. I didn't shoot to kill. He was coming on with the scantling." He goes on then to say that other companions of the deceased were there and were coming on up behind the deceased, and that he shot purely in self-defense and because he thought his life was in danger. Taking into consideration the fact that the accused fired two shots, that one of these shots was fired before the deceased drew any weapon, and that the other was fired after he drew it, the jury had the right to render the verdict finding the accused guilty of manslaughter, on the theory of mutual combat, induced

by an unjustifiable shooting committed by the accused before the deceased began his assault. It must be understood that the jury has the right to believe the accused's statement in whole or in part, or to disbelieve all of it; they may believe part of it in preference to the testimony, and then disbelieve other parts even though there is no contradictory testimony; and when this court comes to pass upon the question as to whether manslaughter is involved, we must recognize the jury's right thus to segregate the accused's statement into such parts as they believe and into such parts as they do not believe. In other words, it is not required that the verdict of the jury, in order to be lawful, shall be consistent with either the testimony of the State in solido, or the statement of the accused in solido. It may be supported by evidence selected from either of the sources.          •

2. One of the assignments of error complains that the judge submitted to the jury instructions on the subject of involuntary manslaughter. We find no theory of the case to which this instruction would be applicable or appropriate. Possibly the judge took the view that they were authorized by the contention of the accused that he did not intend to kill when he shot. As we held in the *Maughon* case, 7 *Ga. App.* 660 (67 S. E. 842), if a person is killed from a gunshot wound-inflicted by one who intended to shoot the gun, the homicide is either murder, voluntary manslaughter, justifiable homicide, or else an accidental killing; and if the person who fired the gun intended to shoot at the person he killed, it can not be involuntary manslaughter. However, abstract error alone is not sufficient to authorize a new trial. It must appear that the error resulted in injury. In this case no injury resulted, because the jury found the accused guilty of voluntary manslaughter. If the jury had found the accused guilty of involuntary manslaughter, there would be room for complaint of the inappropriate instructions.

3. Much of the record is devoted to an elaboration of exceptions as to the court's allowing physicians and others to testify as to the deceased's condition, and as to declarations made by him as to his condition, and as to statements made by him tending to show his consciousness, and the testimony of another witness who testified that the deceased, at the time when he was in the condition described, made certain declarations, afterwards introduced as dying declarations. Their contention, boiled down, amounts to this:

·that a witness who does not testify to the alleged dying declaration can not testify as to the facts essential to show that the deceased was in such a condition as to have made a declaration legally admissible as a dying declaration; and that a witness who did not have sufficient knowledge of the deceased's condition to state the fact adequate to make a showing for the introduction of the dying declaration is not competent to testify as to what the deceased person said. The point is palpably without merit.

4. There are many exceptions taken to the charge of the court. We have gone through the record carefully and considered these assignments one by one. Viewed insularly, or as segregated from the context, some of these instructions may appear to be erroneous, but when viewed in connection with the charge as a whole, it is plain that they are free from material error, and that the judge fairly submitted to the jury all the defenses to which the accused was entitled. The charge is even more favorable to the accused than the circumstances appearing in the case actually required. We do not, of course, criticize the court for this fairness; we merely refer to the fact to show that the present plaintiff in error has no just cause for complaint.                         *Judgment affirmed.*